UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

MCPHILLIPS FLYING SERVICE, INC.,                    Case No. BT 25-02011
                                                    Chapter 11 (Subchapter V)
      Debtor.

_____/

## OPINION REGARDING DEBTOR'S ELIGIBILITY FOR SUBCHAPTER V

<u>Appearances:</u>

A. Todd Almassian, Greg J. Ekdahl, and Sarah A. LaSata, Grand Rapids, Michigan, attorneys for McPhillips Flying Service, Inc.

Marc N. Swanson and Ronald A. Spinner, Detroit, Michigan, attorneys for Robert T. Kendall III and Robert T. Kendall IV, individually and as Co-Personal representatives of the Estate of Adam Wolford Kendall, deceased.

Susan Jill Rice and Elizabeth McLachlan, Traverse City, Michigan, attorneys for Charlevoix State Bank.

Perry G. Pastula, Wyoming, Michigan, attorney for Paul Welke and Angela LeFevre-Welke.

Scott A. Chernich, Lansing, Michigan, Subchapter V Trustee.

Elizabeth K. Patrick, Grand Rapids, Michigan, Attorney for the United States Trustee.


## I.      <u>INTRODUCTION AND JURISDICTION</u>.

This matter is before the court on the Objection and Motion to Revoke the Debtor's Election to Proceed Under Subchapter V of Chapter 11 (herein, the "Eligibility Objection") filed by Robert T. Kendall III and Robert T. Kendall IV, individually and as Co-Personal Representatives of the Estate of Adam Wolford Kendall, deceased (herein, the "Kendall Estate" or the "Movants").  Prior to the filing of the bankruptcy case, Adam Kendall was killed in a plane crash involving an aircraft operated by the Debtor, McPhillips Flying

1

Service, Inc. (d/b/a Island Airways).  The Movants brought a state court lawsuit against the Debtor for wrongful death, negligence and other causes of action stemming from the plane crash.  In the course of discovery conducted in the wrongful death action, the Movants came to believe that the Debtor had violated certain terms of loans it received from the United States government under the Economic Injury Disaster Loan ("EIDL") program.  That belief led Movant Robert T. Kendall IV to file a Qui Tam Complaint against the Debtor in the United States District Court for the Western District of Michigan.  The Qui Tam Complaint alleges that the Debtor violated the False Claims Act and wrongfully misapplied loan proceeds triggering liability for civil penalties under 15 U.S.C. § 636(b).

While the Qui Tam Action was pending, but before the Debtor was served with the complaint and before the United States had determined whether to intervene, the Debtor filed a Chapter 11 petition and elected to proceed under Subchapter V.  Pursuant to § 1182(1) and § 101(51D) of the Bankruptcy Code,[1] relief under Subchapter V is generally only available to "small business debtors," who among other criteria, have not more than $3,424,000 in "aggregate noncontingent liquidated secured and unsecured debts" as of the filing date.  The Eligibility Objection currently before the court argues that the damages alleged in the Qui Tam Action are noncontingent and liquidated debts such that, when combined with the Debtor's other liabilities, they cause the Debtor to exceed the Subchapter V debt limit.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The case has been referred to this bankruptcy court for determination.  28 U.S.C. § 157(a); LGenR

---

[1]   The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

3.1(a) (W.D. Mich.).  The contested matter before the court is a core proceeding and this court has authority to enter a final order.  28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate).

## II.     FACTUAL AND PROCEDURAL BACKGROUND.

### A.   *The Debtor's Business, Prepetition Accident, and Wrongful Death Suit*.

The Debtor provides on-demand passenger flights, freight delivery and distribution, and emergency medical evacuation flights and services to and from Beaver Island and Charlevoix, Michigan.  (Dec. of Angela LeFevre-Welke, Dkt. No. 6, at ¶ 4.) The Debtor is owned by Paul Welke.  (*Id*. at ¶ 5.)  Angela LeFevre-Welke is the company's President.  (*Id*. at ¶ 1.)

On November 13, 2021, an airplane operated by the Debtor crashed near a runway on Beaver Island, killing the pilot and three passengers, and seriously injuring the sole surviving passenger.  (Eligibility Objection, Dkt. No. 74, at ¶ 5.)  Adam Kendall, and his wife Kate Leese, were among the passengers killed in the crash.  (*Id*.)  Adam was the son of Movant Robert Kendall III and the brother of Robert Kendall IV.  (*Id.* at ¶ 4.)  On April 28, 2022, the Movants filed suit against the Debtor, Paul Welke, Angela LeFevre-Welke, and Neal Boyle (the Debtor's Director of Maintenance) in Charlevoix County Circuit Court for negligence and wrongful death damages in connection with the crash, as well as other causes of action (the "Wrongful Death Action").  (Dkt. No. 74, at ¶ 6; Debtor's Response to Eligibility Objection, Dkt. No. 85, at ¶ 6.)

### B.   *The EIDL Loans and Qui Tam Complaint*.

Also prior to the petition date, the Debtor obtained a series of loans from the SBA under the Economic Injury Disaster Loan ("EIDL") program, which was instituted by the

United States government to assist small businesses in recovering from economic injury caused by declared disasters, including the COVID-19 pandemic.  (Dkt. No. 74, at ¶ 21.)  The Debtor took out its first EIDL loan, in the amount of $150,000, on May 19, 2020.  (*Id.* at ¶ 22; Claim 18-1, Part 3, at Addendum A.)  It obtained additional funds through three subsequent requests and modifications on July 29, 2021, October 29, 2021, and April 6, 2022.  (Claim 18-1, Part 3, at Addendum A.)  The total principal amount the Debtor borrowed from the SBA under the EIDL loans was $980,000.  (*Id.*)

To obtain the original EIDL loan, the Debtor was required to execute a Loan Authorization and Agreement ("LA&A"), Note, and Security Agreement with the SBA.  (Claim 19-1, Exh. A.)  For each subsequent extension, the Debtor also executed an Amended LA&A, a Modification of Note, and an Amended Security Agreement.  (Claim 19-1, Exhs. B - D.)  The LA&A's set forth various conditions and limitations on the use of the loan proceeds, including that the proceeds could only be used "for working capital" and, to the extent possible, must be used to purchase American-made goods.  (*See, e.g.*, Claim 19-1, Exh. D, LA&A, at p. 3.[2])  These conditions are clearly set forth on each of the four Loan Agreements, all of which were signed by Paul Welke on behalf of the Debtor.  (*See* Claim 19-1, at Exhs. A - D, LA&A's, at p. 7.)  In a section entitled "CIVIL AND CRIMINAL PENALTIES" each LA&A also stated:

> Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b).  In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: . . . treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729 . . . .

---

[2]      In this opinion, citations to a particular page of a document refer to the page numbers assigned by the court's CM-ECF system.

(Claim 19-1, Exhs. A - D, LA&A's, at p. 6.)   The original Note and subsequent modifications included a similar warning that:  "Anyone who wrongfully misapplies any proceeds of the loan will be civilly liable to SBA for one and one-half times the proceeds disbursed, in addition to other remedies allowed by law."  (Claim 19-1, Exh. A, Note, at ¶ 9; Exhs. B - D, Note Mods., at ¶ 12.)

The Kendall Estate became aware of the EIDL loans through discovery conducted in the state court Wrongful Death Action.  (Dkt. No. 85, at ¶ 19.)  In the course of that discovery, the Movants also retained a forensic accountant who reviewed the Debtor's financial records and concluded that the Debtor had made material misrepresentations to obtain the EIDL loans and had misused the proceeds in violation of the loan terms.  (Dkt. No. 74, Exh. 2, at ¶ 20.)  On October 16, 2024, Robert T. Kendall IV, as Relator, filed a Qui Tam Complaint in the United States District Court for the Western District of Michigan (the "Qui Tam Complaint" or "Qui Tam Action").  (Dkt. No. 74, Exh. 2; *see United States ex rel. Kendall v. McPhillips Flying Service, Inc.*, Dist. Ct. Case No. 1:24-cv-1084.)

The Qui Tam Complaint alleges that the Debtor misrepresented its eligibility for the EIDL loans, used the loan proceeds to purchase fixed assets (including a new plane, new landing gear, and a new forklift) rather than for working capital, and that the plane and landing gear were manufactured in Britain, not the United States.  The complaint asserts that these actions constituted violations of the False Claims Act, 31 U.S.C. § 3729 (the "FCA Claims").  Section 3729(a)(1) of the FCA imposes liability on any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (G)   knowingly makes, uses, or causes to be made or used, a false record
> or statement material to an obligation to pay or transmit money or
> property to the Government . . . .

31 U.S.C. § 3729(a)(1)(A), (B), & (G).   The Qui Tam Complaint requests that a fine of $13,946 to $27,894 be imposed against the Debtor for each misrepresentation it made to the SBA (referred to herein as the "Per-Misrepresentation Penalties"),[3] plus treble damages under the FCA (collectively with the costs and interest requested, the "FCA Damages").   (*See* 31 U.S.C. § 3729(a)(1); Dkt. No. 74, Exh. 2, at p. 14 & n.3.)   The complaint also alleges that the Debtor's misconduct "violates several other federal statutes, both civil and criminal."   (Dkt. No. 74, Exh. 2, at p. 15.)   Included on this list is a request that a civil penalty equal to one and one-half times the original principal loan amount be imposed against the Debtor for wrongful misapplication of loan proceeds under 15 U.S.C. § 636(b) (the "Section 636(b) Penalty").   In summary, the prayer for relief requests the following damages:

- Actual damages;

- Treble damages of three times the actual damages;

- Civil penalties on a per-misrepresentation basis under the FCA;

- A civil penalty of one-and-one half times the original principal amount of [the Debtor's] EIDL loan under 15 U.S.C. § 636(b); and

- Costs, pre- and post-judgment interest, and all other appropriate relief.

(collectively, the "Qui Tam Damages") (Dkt. No. 74, Exh. 2, at p. 16.)   The complaint does not include actual dollar amounts for any of these categories of alleged damages.   In the prayer for relief, the Relator also asks for a judgment in his favor "for a percentage of all

---

[3]   The penalties requested in the complaint represent the statutory "civil penalty of not less than $5,000 and not more than $10,000" as adjusted for inflation.   *See* 31 U.S.C. § 3729(a)(1).

damages and penalties awarded to the United States, reasonable and necessary attorneys' fees, costs, and interest." (Dkt. No. 74, Exh. 2, at p. 16.)

The Qui Tam Complaint was originally filed under seal in the District Court, as required by the FCA, and was not immediately served on the Debtor. The complaint remained under seal as of the filing of the Debtor's bankruptcy case. As of that date, the United States was investigating the claims, but had not yet decided whether to intervene.

For its part, the Debtor states that it first learned the EIDL loans were under investigation on April 9, 2025, when it received a Civil Investigative Demand letter from the U.S. Department of Justice (the "DOJ"). (Debtor's Supplemental Brief, Dkt. No. 119, Solemn Affirmation of Angela LeFevre-Welke, Exh. 1, at Exh. C.) The letter states:

> This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that, inter alia, McPhillips Flying Services, Inc. submitted false claims for Economic Injury Disaster Loan ("EIDL") loans.

(*Id.*) The letter requests information regarding the Debtor's use of the loan proceeds but makes no specific mention of potential civil penalties for wrongful misapplication of funds under Section 636(b) or that the Debtor was being investigated for such violations. (*Id.*)

The Debtor responded to the DOJ's request for information on May 1, 2025. (Dkt. No. 119, Exh. 1, at ¶ 8c & Exh. D.) In early July 2025, the DOJ contacted Angela LeFevre-Welke to arrange a follow-up meeting to discuss the documents the Debtor had provided. (*Id.* at ¶ 8d.) That meeting was held on July 9, 2025, but was terminated by Assistant United States Attorney Ryan Cobb after Ms. LeFevre-Welke advised him that the Debtor had retained counsel and was considering filing for bankruptcy relief. (*Id.* at ¶ 8f.) AUSA Cobb told Ms. LeFevre-Welke that the meeting would be rescheduled so counsel could

7

attend. (*Id.*)  The Debtor was first informed of the existence of the Qui Tam Complaint in an email sent by AUSA Cobb to Ms. LeFevre-Welke and Debtor's counsel after the terminated meeting on July 9, 2025. (*Id*. at ¶ 8g.)  The Debtor and its counsel received a copy of the complaint on July 10, 2025, just five days prior to the bankruptcy filing.   (*Id*. at ¶ 8h.)

The Debtor states that, outside of the DOJ's general investigation into the allegations in the Qui Tam Complaint, it had not received any communication from the SBA via its message portal indicating that it was under investigation for wrongful misapplication of funds under Section 636(b).  (Dkt. No. 119, Exh. 1, at ¶ 4.)  It was likewise never advised pre-filing that the SBA had made any determination or conclusion regarding the alleged misapplication of funds.  (*Id*. at ¶ 5.)  As of the petition date, the SBA had not called the Debtor's EIDL loan or attempted to collect any civil penalty.  (*Id.* at ¶ 3.)  The Debtor has continued to make the contractual monthly payments on the EIDL loans in the ordinary course.  (*Id.*)

C.  *The Debtor's Bankruptcy Filing*.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 15, 2025, and elected to proceed under Subchapter V.  (Voluntary Petition, Dkt. No. 1.)  The Debtor scheduled a total of $2,204,006.22 in secured and unsecured debts to non-insiders as of the petition date.  (*Id*. at p. 8 & 21.)  This includes the secured claim of the SBA, in the amount of $965,789, for the principal and interest due and owing under the EIDL loans.[4]  (*Id*. at p. 19.)  It also includes the unsecured claim of the Kendall Estate,

---

[4]      The Final Cash Collateral Order entered in this case also lists the amount of the SBA's allowed secured claim as $965,789.  (*See* Order Granting Debtor's Motion for Entry of a Final Order (A) Authorizing it to Use Cash Collateral and (B) Providing Adequate Protection and Other Relief, Dkt. No. 68, at p. 1-2.)

in the amount of $1.00, which is listed as contingent, unliquidated, and disputed and an unsecured claim listed in the name of Ryan Cobb, the AUSA assigned to the Qui Tam case, in the amount of $0, which states that it is scheduled for "notice only." (*Id.* at p. 21-22.)   Section 7.2 of the Debtor's Statement of Financial Affairs states that additional disclosures regarding pending legal actions will be made by the Debtor.  (*Id.* at p. 30.) The Debtor informed the court that the Qui Tam claim was scheduled in this manner because, as of the filing of the petition, the case remained under seal in the District Court.[5]

Since the bankruptcy filing, both the Relator and the United States have filed proofs of claim for damages asserted in the Qui Tam Action.  Relator Robert T. Kendall IV filed Claim 5-1 comprised of the Treble Damages, the Per-Misrepresentation Penalty, and the Section 636(b) Penalty sought in the Qui Tam Action, plus the Relator's share of any recovery and $96,329 in attorney's fees and costs incurred as of the petition date.  The attachments to Claim 5-1 state that the total amount of "liquidated damages" under the Qui Tam Complaint is "not less than $4,506,329." (Claim 5-1, Part 2, at p. 2.)  For its part, the SBA filed Claim 18-1, in the total amount of $945,978.69, for the principal due under the EIDL loans.[6]  The United States also filed two claims relating to the damages sought in the Qui Tam Action.  Claim 6-1 is an unsecured claim for "False Claims Act Liability, 31 U.S.C. § 3729 et seq." (Claim 6-1, Part 2.)  The attachments to the proof of claim

---

[5]     At the First Day Hearings in this case, held on July 21, 2025, the Debtor requested an *in camera* meeting with the court and all counsel.  All parties agreed to the *in camera* meeting.  During the meeting, the Debtor disclosed the existence of the pending Qui Tam Action and provided a copy of the complaint for the court's review.

[6]     Claim 18-1 includes a secured claim of $943,458.49 and an unsecured claim of $2,520.20.
     The fact that the amount of the SBA's proof of claim for the principal due under the EIDL loans differs slightly from the amount scheduled by the Debtor and reflected in the Final Cash Collateral Order is not material to the eligibility question before the court.

specify that the claim is comprised of the Treble Damages (i.e., the total principal amount of the EIDL loans, $980,000, times three) plus a Per-Misrepresentation Penalty in the maximum amount of $28,619 for each of the four loan disbursements. (*Id*. at p. 4.) The claim states that these damages and penalties combine to give the United States a claim against the Debtor for liability under the FCA in the "approximate amount of $3,054,476." (*Id*. at p. 6.) Claim 19-1 is also an unsecured claim, filed by the SBA in the total amount of $1,470,000, for "Misuse of Funds, 15 U.S.C. § 636(b)." (Claim 19-1, Part 2.) The attachments to the claim indicate that the $1,470,000 represents the original principal amount of the EIDL loans, $980,000, multiplied by 1.5. (Claim 19-1, Part 3, p. 1.) The Summary of Claim confirms that this portion of the claim is for the Section 636(b) Penalty, and states that the United States "learned that [the Debtor] misused the EIDL proceeds," including by purchasing a fixed asset airplane from a foreign company, "[s]everal months before [the Debtor] filed for bankruptcy on July 15, 2025." (*Id*. at p. 3.)

The Qui Tam Action remained under seal in the District Court throughout the first months of the Debtor's bankruptcy case,[7] but was recently unsealed by an order entered by the District Court on September 22, 2025.[8] (*See United States ex rel. Kendall v.*

---

[7] After the filing of the bankruptcy case, the District Court entered an Order granting the United States of America's Motion for Order Further Lifting Seal to Allow Disclosure of Qui Tam Suit in Bankruptcy Case. (Dkt. No. 74, at Exh. 3.) The Order permitted disclosure of the Qui Tam Complaint "and the existence and nature of [the] qui tam action to the Bankruptcy Court judge and to the individuals, businesses, and agencies involved in the Bankruptcy Case" provided that any pleadings including such disclosure were filed under seal. (*Id*.) In accordance with the District Court's Order, this court entered its own Order Authorizing the Submission of Documents Under Seal in this bankruptcy case. (Dkt. No. 67.)

[8] After entry of the District Court's Order unsealing the Qui Tam Action, this court also entered an Order Vacating Prior Order Authorizing the Submission of Documents Under Seal and Unsealing Documents and Adversary Proceeding Currently on File. (Dkt. No. 108.)

*McPhillips Flying Service, Inc.*, Case No. 1:24-cv-1084, at Dist. Ct. Dkt. No. 31.)  The order indicates that the United States had elected to intervene in the Qui Tam Action "for purposes of settlement, pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)."  (*Id.*; *see also* Notice of Election to Intervene for Purposes of Settlement, at Dist. Ct. Dkt. No. 30.)

D.   *The Eligibility Objection*.

The Kendall Estate timely filed its Eligibility Objection on August 29, 2025.[9]  (Dkt. No. 74.)  The objection generally argues that the damages asserted in the Qui Tam Action are noncontingent, liquidated debts that should be included when calculating the Debtor's eligibility for relief under Subchapter V.   The Movants suggest that portions of the damages alleged in the Qui Tam Action, particularly the Section 636(b) Penalty (which would total $1,470,000 as reflected in the SBA claim) or the Treble Damages under the FCA (which the Movants assert would total $2,940,000), are liquidated because they are readily calculable.   The Movants also argue that the conduct needed to trigger the Debtor's liability – namely the misapplication of EIDL proceeds or knowing misrepresentations under the FCA – occurred prepetition.  According to the Movants, this fact renders the debts noncontingent.  Adding either the Section 636(b) Penalty or the FCA Damages to the non-insider secured and unsecured debts scheduled by the Debtor pushes the Debtor over the Subchapter V debt limit.

---

[9]    Federal Rule of Bankruptcy Procedure 1020(b) provides that the United States trustee or a party in interest may object to the small business debtor designation "within 30 days after the conclusion of the meeting of creditors held under § 341(a) or within 30 days after an amendment to the designation is filed, whichever is later."  Fed. R. Bankr. P. 1020(b).  In this case, the § 341 meeting was held and concluded on August 11, 2025. (Dkt. No. 52.)

The Debtor filed a response to the motion, disputing the Movant's characterization of the damages asserted in the Qui Tam Action as noncontingent and liquidated. (Dkt. No. 85.) The Debtor generally argues that, as of the filing of the bankruptcy case, it had only recently learned of the Qui Tam Action, had not been served with the complaint, and had not responded to the allegations therein. In addition, the Debtor points out that it had not been specifically notified that it was being investigated for wrongful misapplication of loan proceeds for purposes of imposing a civil penalty under Section 636(b) and certainly had not been informed that the SBA had actually imposed, assessed, or attempted to collect any such penalty. Under the circumstances, the Debtor asserts that it scheduled the alleged Qui Tam Damages at $0, with the good faith belief that such damages were contingent and unliquidated as of the filing date.

Concurrences with the Debtor's positions were filed by Paul Welke and Angela LeFevre-Welke, the Subchapter V Trustee, and Charlevoix State Bank. (Dkt. Nos. 87, 88 & 97.) A hearing on the Eligibility Objection was held before this court on September 30, 2025. During the hearing, the United States Trustee indicated that it was not taking a formal position on the objection but noted that it had not filed its own objection to the Debtor's Subchapter V designation. (Transcript of Hearing, Dkt. No. 125, at p. 76-77.) After the hearing, the court requested supplemental briefing. The Debtor and the Movants each filed a supplemental legal memorandum on October 7, 2025. (Dkt. Nos. 117 & 119.)

### III.    DISCUSSION.

The legal issue presented by the Movants' objection is relatively straightforward: do the damages asserted in the Qui Tam Action, or any portion thereof, represent noncontingent liquidated debts as of the filing of the petition, such that they should be

12

included in calculating the Debtor's eligibility for relief under Subchapter V?  The damages asserted in the Qui Tam Action included a claim for civil penalties under Section 636(b) and a claim for damages under the False Claims Act, either of which would be sufficient to push the Debtor over the Subchapter V debt limit.[10]  Accordingly, to answer to main question presented, the court must analyze whether either claim was noncontingent and liquidated as of the filing date.

A.  *Subchapter V Eligibility, Scope of Inquiry, and Burden of Proof*.

Section 1182(1) defines "debtor" for purposes of Subchapter V as "a small business debtor."  The term "small business debtor" is defined in § 101(51D) as:

> a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) *that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,424,000* (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor.

11 U.S.C. § 101(51D)(A) (emphasis added).[11]  In this case, there is no dispute that the Debtor is a person engaged in commercial or business activities and that its debts arose from those activities.  The sole issue raised by the Eligibility Objection is whether the Debtor's aggregate noncontingent liquidated debts exceed the Subchapter V debt limit.

Before turning to the nature and amount of the claims at issue in this case, the court must first address two preliminary issues regarding its eligibility analysis.  First, in

---

[10]   The parties have analyzed these two categories of claims separately, despite the fact that both were alleged in the broader context of the Qui Tam Action.  Given that the basis for the liability is slightly different for each type of claim, the court has also considered them separately.

[11]   This statutory definition is subject to certain exceptions, set forth in § 101(51D)(B), which are not relevant here.

their briefing and at oral argument, the parties devoted significant attention to the issue of how far the court's eligibility inquiry should extend in this chapter 11 case.  The Debtor, relying mostly on Chapter 13 caselaw, including the Sixth Circuit's decision in *Comprehensive Accounting Corp. v. Pearson* (*In re Pearson)*, 773 F.2d 751 (6th Cir. 1985), argues that eligibility issues are "normally" to be determined by reference "to the debtor's schedules checking only to see if the schedules were made in good faith."  *In re Pearson*, 773 F.2d at 757; *see also In re Perkins*, 581 B.R. 822, 832 (6th Cir. B.A.P. 2018) (applying *Pearson* standard in chapter 12 case).  The Movants counter that a more expansive inquiry is necessary in Subchapter V cases and requires examination of all evidence relevant to the status of claims as of the petition date.  *See, e.g., In re Parking Management, Inc.,* 620 B.R. 544, 551 (Bankr. D. Md. 2020) (suggesting that the standards for determining eligibility under chapters 12 and 13 may be useful for purposes of § 1182, but noting that Subchapter V cases will often involve "more complex creditor relationships" and "bona fide disputes over the proper characterization of creditor claims" and ultimately concluding that the court "need not find a lack of good faith or candor to conclude it should review the claims" to determine eligibility).

The court finds that the arguments raised by the parties on this point take different routes but ultimately end in the same place.  The Debtor is correct that *In re Pearson* suggests that the Debtor's schedules are "normally" the appropriate place to begin an eligibility inquiry.  *In re Pearson*, 773 F.2d at 757.  Under the circumstances of this chapter 11 case, including that the Debtor had not yet been served with the Qui Tam Complaint and that the District Court action was under seal as of the filing date, the court has no doubt that the Debtor acted in good faith in scheduling the Qui Tam Action "for notice

14

only" and valuing the alleged damages at $0.  However, *Pearson* also discussed potential exceptions to this general rule, including situations where "it appears to a legal certainty" that the claim or its amount is other than what the debtor says it is.  *Id.* (quoting *St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288-90, 58 S. Ct. 586 (1938)).  Here, the Debtor's schedules do not explicitly state whether the Qui Tam Damages are contingent or unliquidated, but implicitly view them as one or both in electing to proceed under Subchapter V.  In addition, while the ultimate characterization of the Qui Tam Damages is far from clear, it does appear certain that their potential value is more than the $0 scheduled by the Debtor.  The Debtor's schedules do not, by themselves, answer the eligibility question in this case.  Accordingly, the Movants are also correct that the court's inquiry can, and in this instance, should, extend beyond the Debtor's schedules, even though the schedules were prepared in good faith.  *See, e.g., In re Smith*, 365 B.R. 770, 780 (Bankr. S.D. Ohio 2007) (*Pearson* makes the debtor's petition and schedules "the starting point" in the eligibility analysis, but the "schedules – even if filed in good faith – are not dispositive of a debtor's eligibility for Chapter 13 relief").  To hold otherwise would "eviscerate" statutory eligibility requirements by allowing debtors to circumvent debt limits "by simply ignoring" what they know about potential liabilities and "listing the amounts of the debts as 'unknown'" in the schedules.  *Matter of Redburn*, 193 B.R. 249, 256 (Bankr. W.D. Mich. 1996) (citing *In re McGovern*, 122 B.R. 712, 714 (Bankr. N.D. Ind. 1989) ("Congress did not intend that debtors would be given exclusive control over the accessibility to Chapter 13 or be permitted to circumvent its debt ceilings by the artful manipulation of the information contained in bankruptcy filings.")).  By the same token, the court need not blindly "accept a creditor's characterization of its claim."  *In re Smith*,

15

365 B.R. at 780.  "Rather, 'the court is required to look beyond the information given and make an independent determination.'"  *Id*. at 781 (quoting *McGovern*, 122 B.R. at 714).

When it comes to determining eligibility in Subchapter V cases, "time is of the essence," just as it is in a Chapter 13 context, and eligibility questions must be answered as efficiently and inexpensively as possible.  *In re Pearson*, 773 F.2d at 757.  For this reason, this court believes its inquiry need not be expansive and should not extend so far as an evidentiary hearing on the merits of the claims at issue.  *Id*.  The court will, however, review the record and make an independent determination as to whether the claims at issue have been scheduled in good faith and whether the claims were properly characterized by the debtor as contingent or unliquidated as of the date of filing.  *In re Rohl*, 298 B.R. 95, 99 (Bankr. E.D. Mich. 2003) (holding that it "is appropriate" for the court "to consider both the Debtor's schedules themselves and other evidence to ascertain whether the Debtor's assessment of [its] debts in the schedules represents a good faith assessment").

Second, neither the Bankruptcy Code nor the Rules specify which party bears the burden of proving eligibility to be a Subchapter V debtor.  *In re Evergreen Site Holdings, Inc*., 652 B.R. 307, 316 (Bankr. S.D. Ohio 2023) ("The Bankruptcy Code and Rules are silent as to who has the burden of proof on the issue of a debtor's eligibility to proceed under Subchapter V when an objection is filed.").  This court agrees with the majority of courts which have concluded that the burden is ultimately on the Debtor to establish its eligibility for relief under Subchapter V.  *Id*. (discussing the split of authority and adopting the majority view that the burden is on the debtor, primarily due to the "many advantages"

16

Subchapter V offers a debtor and to be consistent with the allocation of the burden when determining eligibility under other chapters of the Bankruptcy Code).

B. *Are the Qui Tam Damage Claims Noncontingent and Liquidated?*

As previously noted, § 1182(1) and § 101(51D) generally limit Subchapter V eligibility to small business debtors with aggregate noncontingent liquidated secured and unsecured debts of less than $3,424,000 as of the filing date.  The Bankruptcy Code defines a "debt" as "liability on a claim."  11 U.S.C. § 101(12).  A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."  11 U.S.C. § 101(5)(A).[12]

---

[12]     In this case, the Movants have consistently and repeatedly argued that the fact that both the Relator and the United States have claims for the damages asserted in the Qui Tam Action equates to those claims being noncontingent and liquidated for purposes of eligibility.  They suggest that this is particularly true because both the Relator and the United States have filed proofs of claim for the Qui Tam Damages, which are considered prima facie evidence of the validity and amount of the claims under Fed. R. Bankr. P. 3001(f).

It is clear from the Code's definition of "claim" that Congress intended for that term to have the "broadest possible definition . . . [including] all legal obligations of the debtor, no matter how remote or contingent."  *In re Parks*, 281 B.R. 899, 901 (Bankr. E.D. Mich. 2002) (quoting H.R. Rep. No. 95-595, at 649 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963).  As a result, the fact that a creditor holds a claim against the debtor – even one presumed to have prima facie validity under Bankruptcy Rule 3001(f) – does not answer the question of whether that claim is contingent or unliquidated for purposes of eligibility calculations.  *See generally Id.* at 902 (holding that "a right to payment need not be currently enforceable in order to constitute a claim that is dischargeable in bankruptcy") (citing *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prod. Corp.),* 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998) ("Because contingent and unmatured rights of payment are 'claims' under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code.").

1. <u>Definition of Noncontingent</u>.

"Neither the Bankruptcy Code, nor the legislative history provide a definition for the term 'contingent' or the negative form 'noncontingent'" which is used in § 101(51D). *Matter of Redburn*, 193 B.R. 249, 259 (Bankr. W.D. Mich. 1996). However, it is well-settled that "a contingent debt is 'one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event *which will trigger the liability of the debtor* to the alleged creditor.'" *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1997) (quoting *Brockenbrough v. Comm'r*, 61 B.R. 685, 686 (W.D. Va. 1986) (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd per curiam*, 646 F.2d 193 (5th Cir. 1981))) (emphasis added); *see also Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997). A "debt is not automatically rendered 'contingent' solely by virtue of its being disputed." *In re Lambert*, 43 B.R. 913, 923 (Bankr. D. Utah 1984); *see In re Albano*, 55 B.R. 363, 366 (N.D. Ill. 1985) (explaining that this is true even though "both contingency and dispute are related to the existence of ultimate liability."). Rather, the contingency requirement focuses on "the nature or origin of liability" and more specifically "relates to the time or circumstances under which the liability arises." *In re Mazzeo*, 131 F.3d at 303 (citation omitted). Such liability does not necessarily "mean the same as judgment or remedy," but instead refers to the "condition of being obligated to answer for a claim." *Id.*; *In re Lambert*, 43 B.R. at 923 n.8 (citation omitted).

Courts applying this definition have cited the guaranty of a promissory note executed by a third party as a "paradigmatic" example of contingent liability. *In re Albano*, 55 B.R. at 366; *see In re All Media Properties, Inc.*, 5 B.R. at 133 (discussing contingent

18

claims in the context of an involuntary bankruptcy petition).  In such instances, both the creditor and guarantor know there will be liability under the guaranty only if the principal maker of the note defaults.  *In re All Media Properties, Inc.*, 5 B.R. at 133.  No obligation arises until that default occurs, and the liability remains contingent until that time. *Id*.; *In re Albano*, 55 B.R. at 366 ("Contingent debts (in the sense of dependency on a future event) involve no liability unless the condition precedent (e.g., a default by a principal) occurs.").

At the other end of the spectrum, simple contractual obligations are typically viewed as noncontingent.  *In re Albano*, 55 B.R. at 366-67 (*citing In re All Media Properties, Inc.*, 5 B.R. at 133).  This is because parties who enter into a contract would normally consider their obligations or liability under the agreement as noncontingent and would not contemplate that any further act had to be completed in order to trigger a legal obligation to perform under the contract terms.  *In re All Media Properties, Inc*., 5 B.R. at 133.  Subsequent events may cause the parties to dispute their liability under the contract, but those disputes do not change the noncontingent nature of the contractual obligations at the time the transaction occurs.  *Id*.  Other courts have described this type of liability as "presumptive," in that it is presumed to exist "unless cut off by a condition subsequent" such as entry of a judgment finding that no liability exists.  *In re Albano*, 55 B.R. at 366. However, even breach of contract claims are not always noncontingent.  For example, in situations involving disputes as to whether a debtor was a party to the contract at issue, courts have held that the debt for breach of contract was contingent.   In this situation, liability is not presumptive and a subsequent event, like entry of a judgment determining liability, may be required to establish that the debtor actually "owed" the creditor.  *In re*

19

*Beach*, 2024 WL 638668 (D.N.M. Feb. 15, 2024) (unpublished opinion) (citing *In re Baird*, 228 B.R. 324, 326-27 (Bankr. M.D. Fla. 1999)).

Claims that arise when a party is alleged to have committed a tort have also been traditionally cited as clear-cut examples of contingent claims, although the case law on this point is not entirely uniform. *In re All Media Properties, Inc.*, 5 B.R. at 133; *but see In re McGovern*, 122 B.R. 712 (Bankr. N.D. Ind. 1989) (claims for misappropriation of funds by executive director of non-profit organization, which were discovered in audit conducted by Indiana State Board of Accounts, were disputed but not contingent because all events that could give rise to the director's tort liability had already occurred as of the petition date).   Courts that have categorized debts arising from alleged tortious conduct as contingent reason that, in tort cases, it is presumed to have been contemplated by the parties that the alleged tortfeasor would be liable only if and when his act or omission was established as a tort through a determination by a competent tribunal.  *In re All Media Properties, Inc.*, 5 B.R. at 133 (liability for such tort claims is contingent until a "final judgment is entered fixing the rights of the parties"); *cf. Matter of Redburn*, 193 B.R. at 259 (debts for fraud, misrepresentation, and breach of fiduciary duty are not contingent when they were established by state court consent judgment entered prepetition; the debtor's liability under the judgment was fixed and no further event was necessary to trigger that liability).

All of these examples illustrate and support the underlying principle:  a debt is "contingent" if the "debtor's legal duty to pay, i.e., his liability, does not come into existence until triggered by the occurrence of a future event that was reasonably within the presumed contemplation of the parties at the time the original relationship between the

20

parties was created." *In re Lambert*, 43 B.R. at 922-23.   Accordingly, this court must analyze the two types of damage claims asserted in the Qui Tam Complaint to determine whether the Debtor's liability for those claims had been triggered such that the Debtor's legal duty to pay those debts was in existence as of the petition date.

2.   Definition of Liquidated.

The meaning of the term "liquidated" debt is also not set forth in the Bankruptcy Code and has been "variously expressed" in the case law.  *In re Pearson*, 773 F.2d at 754.  As explained by the Sixth Circuit in *Pearson*:

> The common thread throughout the cases . . . has been ready determination and precision in computation of the amount due . . . . [A] liquidated debt [is] one that can be determined by mathematical computation.  Some cases have stated the test as whether the amount due is capable of ascertainment by reference to an agreement or by simple computation.

*Id*.   Since *Pearson* was decided, other courts have "uniformly held that ready determinability is the touchstone for distinguishing between liquidated and unliquidated debts."  *In re Smith*, 365 B.R. 770, 782-83 (Bankr. S.D. Ohio 2007) (collecting cases addressing eligibility under § 109(e)).   By contrast, "if judgment, discretion or opinion," as distinguished from calculation or computation, "is required to determine the amount of the claim," it is unliquidated.  *Id*. at 783 (quoting *In re Horne*, 277 B.R. 320, 324 (Bankr. E.D. Tex. 2002) (additional citations omitted)).

3.   Is the Section 636(b) Penalty Claim Noncontingent and Liquidated?

a.   *Nature of the Section 636(b) Penalty Claim*.

The claim for the Section 636(b) Penalty that is included in the Qui Tam Complaint is based on 15 U.S.C. § 636(b), which addresses disaster loans made by the SBA.  It provides, in pertinent part, that:

21

> Whoever wrongfully misapplies the proceeds of a loan obtained under this subsection shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan.

15 U.S.C. § 636(b).  This statutory provision is implemented by a regulation set forth in 13 C.F.R. § 123.9, which restates the penalty and defines "wrongful misapplication" as follows:

> (a) . . . . If you wrongfully misapply the proceeds of a disaster loan authorized under Section 7(b), you will be liable to SBA for one and one-half times the proceeds disbursed to you as of the date SBA learns of your wrongful misapplication. Wrongful misapplication means the willful use of any loan proceeds without SBA approval contrary to the loan authorization. If you fail to use loan proceeds for authorized purposes for 60 days or more after receiving a loan disbursement check, such non-use also is considered a wrongful misapplication of the proceeds.

13 C.F.R. § 123.9(a).  The regulation also sets forth the procedure through which a wrongful misapplication of loan proceeds is determined:

> (b) If SBA learns that you may have misapplied your loan proceeds from a disaster loan authorized under Section 7(b), SBA will notify you at your last known address, by certified mail, return receipt requested. You will be given at least 30 days to submit to SBA evidence that you have not misapplied the loan proceeds or that you have corrected any such misapplication. Any failure to respond in time will be considered an admission that you misapplied the proceeds. If SBA finds a wrongful misapplication, it will cancel any undisbursed loan proceeds, call the loan, and begin collection measures to collect your outstanding loan balance and the civil penalty.

13 C.F.R. § 123.9(b).

In the present case, there is no evidence that the SBA had begun implementing the procedures set forth in this regulation prior to the filing of the bankruptcy case, much less that it had determined that the Debtor had wrongfully misapplied proceeds and was liable for the Section 636(b) Penalty as of the petition date.  It is evident that the Relator

22

included a request for imposition of the Section 636(b) Penalty in his Qui Tam Complaint. The proof of claim filed by the SBA in this case states that the United States "learned" that the Debtor misused EIDL proceeds "[s]everal months before [the Debtor] filed for bankruptcy." (Claim 19-1, Part 3, at p. 3.) The proof of claim does not elaborate on this statement, so the court cannot determine whether this generally refers to the DOJ's knowledge of the Qui Tam Complaint and its allegations of wrongful misapplication, or to something more specific. The DOJ sent the Debtor a letter seeking information relevant to its investigation of the Qui Tam allegations in April 2025, well prior to the bankruptcy filing. The letter did not specifically mention that the Debtor was being investigated for wrongful misapplication of loan proceeds under Section 636(b). There is no evidence in the record indicating that the SBA ever determined that a wrongful misapplication of loan proceeds had occurred under the statute. Similarly, even if the DOJ letter is viewed as providing the notice required under the regulations, there is no evidence before the court showing that the SBA had completed the procedure set forth in 13 C.F.R. § 123.9(b) as of the filing date. To the contrary, the evidence submitted by the Debtor supports the conclusion that as of the bankruptcy filing, the SBA had not taken any of the actions the regulation states will occur upon a finding of a wrongful misapplication: it had not called the loan, had not informed the Debtor that the Section 636(b) Penalty had been assessed or was due and owing, and had not taken any action to collect or enforce the civil penalty. For its part, the DOJ also had not indicated whether it intended to intervene in the Qui Tam Action as of the filing date.[13] Certainly, there had been no judicial determination that

---

[13]     The Movants argue that, until the DOJ decided whether to intervene in the Qui Tam Action, the SBA had "every right" to continue investigating and pursuing the Section 636(b) Penalty against the Debtor. (Dkt. No. 117, at p. 12-14 (describing this as an "alternative remedy" available under the FCA, 31 U.S.C. §§ 3730(b)(5) & (c)(5).)

the Section 636(b) Penalty was owed in the pending Qui Tam Action as of the filing of the petition.

b. *Is the Section 636(b) Penalty Claim Noncontingent?*

Under these circumstances, and after carefully considering the definition of "contingent" claims, Section 636(b), the relevant regulation, and the Debtor's loan documentation, the court concludes that the Debtor's liability for the Section 636(b) Penalty had not been triggered as of the petition date and therefore, is a contingent debt. Although the potential liability for the Section 636(b) Penalty is clearly contemplated (or even mandatory, as the Movants suggest) in the EIDL loan documents and the statute, the provision is not a simple, self-effectuating contractual or statutory obligation.  Instead, the statutory language, as repeated in the loan documents, states that the Section 636(b) Penalty will only be imposed against a party who "wrongfully misapplies" the EIDL loan proceeds.  *See* 15 U.S.C. § 636(b); Dkt. No. 74, Exh. 4.  The regulation, 13 C.F.R. § 123.9, implements the statute and sets forth a procedure by which the determination of wrongful misapplication is to be made.  The United States may have "learned" of the allegations that the Debtor had misapplied loan proceeds prior to the filing of the bankruptcy case, but there is no evidence to suggest that the SBA had instituted a formal investigation into those allegations under 13 C.F.R. § 123.9(b) prior to the bankruptcy filing.   More importantly, there is no evidence that the SBA ever determined, either before the petition date or since that time, that a wrongful misapplication had occurred. The DOJ had begun a general investigation into the claims asserted in the Relator's Qui Tam Complaint, which

---

Assuming the SBA had the ability to pursue the Section 636(b) Penalty in "parallel" with the Qui Tam Action, it is particularly notable that there is no evidence that the SBA chose to do so.

included a claim for civil penalties under Section 636(b), prior to the bankruptcy filing.  But as of the petition date, the DOJ apparently had not concluded its investigation and had not indicated whether it intended to intervene in the Qui Tam Action.  Indeed, as of the petition date, the only indication that the penalty might be owed was the cause of action asserted in the Relator's complaint.[14]  The court is hard-pressed to conclude that this assertion – made by one of the parties now objecting to eligibility – established the Debtor's obligation to answer for the Section 636(b) Penalty, such that the debt for that penalty should be deemed noncontingent.  Instead, the court concludes that the claim for the Section 636(b) Penalty is contingent because not all of the events necessary to trigger the Debtor's liability for the penalty had occurred as of the petition date.

Although the Movants initially brought 13 C.F.R. § 123.9(b) to the court's attention by citing it in their Eligibility Objection,[15] they have subsequently attempted to downplay the importance of the regulation in triggering the Debtor's liability for the penalties. Instead, they argue that the debt for the penalties should be deemed noncontingent because all of the factual predicates required to trigger the Debtor's liability – i.e., the purchase of the British airplane, landing gear, and forklift – occurred prior to the filing of the petition.

---

[14]    The Debtor argues that the Movant's right to independently enforce the Section 636(b) Penalty differs from his right with regard to the FCA Claims, because the FCA empowers individual relators to bring claims on behalf of the United States and to independently pursue such claims, while Section 636(b) does not.  The court agrees. This further underscores the contingency of Debtor's liability for the penalty pending, at a minimum, some indication from the United States that the penalty was owed.

[15]    The Movants originally cited the regulation in support of their argument that the claim for the Section 636(b) Penalty is readily calculable and therefore, liquidated.  (Dkt. No. 74, at p. 11.)

For this proposition, the Movants primarily cite the Second Circuit's decision in *Mazzeo v. United States* (*In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997).  The debtor in *Mazzeo* was the president of Westfield Financial Corporation.  In the years preceding the debtor's bankruptcy case, Westfield withheld taxes from its employees' wages but failed to remit those amounts to the relevant federal and state taxing authorities.  The amount of Westfield's tax liability was reflected on tax returns that had been signed and filed by the debtor, as president of the company. Just prior to his bankruptcy filing, the State of New York sent the debtor a notice of deficiency for Westfield's unpaid withholding taxes, asserting that the debtor was a responsible person with respect to those taxes.  Instead of contesting the notice as permitted under New York law, the debtor filed a chapter 13 case.  The Second Circuit concluded that the debtor's responsible person liability for the unpaid taxes was noncontingent and liquidated so as to push him over the chapter 13 eligibility debt limit.  In reaching that conclusion, the court applied the general definition of contingent debt as "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger . . . liability." *In re Mazzeo*, 131 F.3d at 303 (citations omitted).  Reasoning that the duty to pay the underlying taxes "derive[d] from statute" and arose prepetition upon the nonpayment of those taxes when due, and that the debtor's personal liability as a responsible person was also "unconditional" under the statute, the court concluded that the debt was noncontingent. *Id*. Although the debtor attempted to distinguish his responsible person liability from ordinary tax obligations by arguing that it required additional determinations to give rise to liability under the relevant statute, the Second Circuit was not persuaded by this distinction.  The court concluded that the "existence of a dispute" as to the liability and

26

"the prerequisite that the claimant establish its claim by a given quantum of proof" meant that the claim was disputed, not that it was contingent, in that the debtor's status did not depend on any event that had not occurred as of the petition date.

This court finds the tax obligations in *Mazzeo* distinguishable from the potential liability for the Section 636(b) Penalty at issue here.  As with liability for breach of contract, tax liability is generally viewed as "presumptive" and therefore, is often noncontingent. *See, e.g., In re Barcal*, 213 B.R. 1008, 1013 (8th Cir. B.A.P. 1997) (liability for assessed taxes is determined "at the time of assessment").  The *Mazzeo* court repeatedly emphasized the presumptive nature of the debtor's tax obligations in its contingency analysis, explaining that both the underlying tax liability and the responsible person liability were imposed under statute and were essentially unconditional.  The fact that these statutory requirements were met was almost objectively certain from the facts before the court:  the corporation withheld the taxes; the debtor, as its president, signed the company's returns; and the taxes were not paid.  The state had also issued a prepetition notice of deficiency, indicating its belief that the debtor was liable as a responsible person.  Under those circumstances, the court deemed the debtor's tax obligations noncontingent.  The court rejected the debtor's argument that the responsible person statute required additional findings about the willfulness of the debtor's actions as a dispute and not a contingency, suggesting instead that the factual predicates for that determination had occurred prepetition.  However, this comment was made in the broader context of tax liability that the court viewed as highly presumptive.

In this case, the liability for the Section 636(b) Penalty is not nearly so presumptive as tax liability in *Mazzeo*.  Although the potential penalty is contemplated in both the

statute and the loan documentation, imposition of the Section 636(b) Penalty is predicated on the loan recipient wrongfully misapplying loan proceeds.  The regulation defines wrongful misapplication as requiring a willful act by the Debtor in violation of the loan terms.  It also sets forth a procedure for making that determination.  As of the filing of the bankruptcy case, the only party who had accused the Debtor of wrongful misapplication was the Movant himself.  Outside of the general investigation into the Qui Tam claims, neither the DOJ nor the SBA had given any indication that it viewed the Debtor as being liable for paying the Section 636(b) Penalty as of the petition date.  The question is not whether the "bad actions" supporting the claim of wrongful misapplication had occurred as of the petition date, but rather, whether the conditions precedent to establishing the Debtor's liability for that violation had occurred.  Under the facts of this case, they clearly had not.  Accordingly, the Section 636(b) Penalty is a contingent debt.[16]

### c. *Is the Section 636(b) Penalty Claim Liquidated*?

Although the court finds that the Debtor's liability for the Section 636(b) Penalty remained contingent as of the filing date, the court also concludes that the Section 636(b) Penalty claim was liquidated.  Stated slightly differently, while some amount of discretion may go into the initial determination of whether loan proceeds have been wrongfully

---

[16]    The court believes its holding on this point is consistent both with the overall holding in *Mazzeo* and with other reported decisions that have found debts to government entities to be noncontingent only when, at a minimum, there has been some type of prepetition notice of deficiency, demand for payment, or other indication of liability.  *See, e.g., In re Robertson*, 143 B.R. 76, 79-80 (Bankr. N.D. Tex. 1992) (claims for civil tax penalties, liability for which was only triggered if the IRS met its burden of proving the underlying violations, were "similar to tort claims" and were contingent obligations); *cf. In re Smith*, 365 B.R. 770, 782 (Bankr. S.D. Ohio 2007) (debtor's liability to the Securities and Exchange Commission was not contingent when the misconduct giving rise to the liability occurred prepetition and "[m]ore importantly" when that liability had "actually been adjudicated" by the District Court in a summary judgment order entered prepetition).

28

misapplied, thus rendering the existence of the Debtor's liability contingent, the amount of that liability is readily determinable.  Section 636(b) clearly states that the amount of the penalty is to be one and one-half times the original principal amount of the loan.  Simple multiplication of the original loan amount of $980,000 by 1.5 provides the liquidated amount of the potential Section 636(b) Penalty, $1,470,000.

### 4.   Are the FCA Claims Noncontingent and Liquidated?

#### a.   *Nature of the FCA Claims.*

The False Claims Act generally "prohibits the knowing submission of false 'claims' to the government" and has an expansive reach, covering "all fraudulent attempts to cause the Government to pay out sums of money."  *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 733 (6th Cir. 1999) (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33, 88 S. Ct. 959 (1968)).  Violations of the FCA may be "enforced through civil actions initiated by the government or suits by private individuals on behalf of the United States, called qui tam actions."  *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1321-22 (11th Cir. 2009); *see* 31 U.S.C. § 3730 (a) & (b).  When a qui tam action is filed by an individual relator, the government has several options for pursuing the litigation.  31 U.S.C. § 3730(b) & (c).  These options range from declining to intervene and allowing the relator to pursue the action to intervening and settling or dismissing the action, even over the relator's objection.  *Id.*; *See United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 845 (6th Cir. 2020).

The Qui Tam Complaint at issue in this case involves claims brought by Relator Robert Kendall IV on behalf of the government under Sections 3729(a)(1)(A), (B) and (G) of the FCA.  Section 3729(a)(1)(A) prohibits "knowingly present[ing], or caus[ing] to be

29

presented, a false or fraudulent claim for payment or approval," while Section 3729(a)(1)(B) prohibits knowingly making or using false statements in support of such claims. 31 U.S.C. § 3729(a)(1)(A) & (B). Section 3729(a)(1)(G) addresses "reverse false claims" and applies to false statements or records made in connection with "money owed to the government, rather than payments made by the government." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024) (citation and emphasis omitted); *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (a reverse false claim arises when a person knowingly accepts an overpayment from the government and fails to refund it).

The United States Supreme Court has recently explained that the FCA's definition of the term "knowingly" encompasses actual knowledge of the falsity, deliberate ignorance of the truth or falsity, or reckless disregard of the truth or falsity of the claim, record or statement at issue. *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 749-50, 143 S. Ct. 1391 (2023) (citing 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)). The knowledge requirement refers to a defendant's "subjective beliefs" and "not to what an objectively reasonable person may have known or believed." *Id.* at 749. In this sense, the FCA definitions track the common law *scienter* requirement for fraud claims, which the Supreme Court noted is "unsurprising" because the FCA "is largely a fraud statute." *Id.* at 750; *see also United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 880-81 (6th Cir. 2017) (explaining that, with limited exceptions, qui tam plaintiffs must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) which apply to averments of fraud or mistake). As of the filing date, the Qui Tam Action at issue in this case was in a very early stage: the United States had not decided whether to intervene and the complaint

30

had not been formally served on the Debtor. Accordingly, the Debtor had not been called upon to admit or deny the allegations of fraud set forth by the Relator in the complaint, and there had not been any type of judicial determination regarding the sufficiency or veracity of allegations.

b. *Are the FCA Claims Noncontingent?*

Unlike the Section 636(b) Penalty, which is typically implemented through the procedure set forth in the regulations, claims under the FCA must be enforced through a civil action. To prevail on the FCA Claims asserted in the Qui Tam Action, the plaintiff (either the Relator or the United States) must show that the Debtor made false claims or statements "knowingly," which involves an inquiry into the subjective knowledge and state of mind of the Debtor and its representatives, a standard akin to the one applied to common law fraud claims. As a result, the court believes that although the FCA Claims derive from statute, liability under the FCA is even less presumptive than the liability for the Section 636(b) Penalty. The FCA Claims closely resemble tort claims in several important respects, including the particularity with which they must be pled and the culpable state of mind that must be shown to establish a violation. Given these characteristics, the court concludes that the FCA Claims were contingent at the time of the filing of the Debtor's bankruptcy case.

As previously discussed, courts have traditionally viewed claims sounding in tort as contingent as to liability until a judicial determination is made fixing the rights of the parties. *See, e.g., In re Blehm*, 33 B.R. 678, 679-80 (Bankr. D. Colo. 1983) ("Tort claims have been considered contingent because they require proof by the plaintiff creditor of the debtor's liability and the amount of damages are, by their very nature, not fixed unless

31

and until a judgment is entered setting the debtor's liability"); *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980).  Although it is well-settled that a judicial determination of liability is not required to render a debt noncontingent, in the case of many types of tort liability, a judgment is the only basis upon which liability may be imposed.  In that sense, a finding of liability by a competent tribunal may be among the "conditions precedent" or "triggering events" that is required to make a debt noncontingent.

As with the Section 636(b) Penalty, the Movants urge the court to adopt the view that the FCA Claims are noncontingent because all of the relevant tortious conduct occurred prior to the filing of the bankruptcy petition.  *See, e.g., In re McGovern*, 122 B.R. 712 (Bankr. N.D. Ind. 1989) (debtor's liability for misappropriating funds from non-profit organization was not contingent, where it was uncovered by a state-conducted audit and all of the misconduct occurred prepetition; the court explained its view that "tort claims will rarely be contingent" because the "events that give rise to the tort claim usually have occurred and liability is not dependent on some future event that may never happen"); *In re Dill*, 30 B.R. 546, 549 (9th Cir. B.A.P. 1983) (holding, for purposes of petitioning creditors' eligibility to file an involuntary case, that "a tort claim ordinarily is not contingent" if the events giving rise to the claim have occurred), *aff'd on other grounds*, 731 F.2d 629 (9th Cir. 1984).  As explained in the context of the Section 636(b) Penalty, the court finds this focus too narrow; instead, the underlying conduct must be analyzed along with the specific nature of the liability to determine whether the events needed to trigger that liability had occurred as of the filing date.  In fact, many of the cases purporting to focus solely on whether the alleged tortious conduct occurred prepetition also implicitly consider

the "presumptive" nature of the liability and often involve some type of prepetition determination that liability existed or was likely to exist.  For example, the allegations of misappropriation in *McGovern* were premised on an audit that was conducted prepetition by the State of Indiana.  In the present case, by contrast, there is nothing in the record to suggest that the Debtor's liability for the FCA Claims was "presumptive" or even likely.  To the extent other cases, like *Dill*, have held tort claims to be noncontingent, even absent any type of prepetition action or determination suggesting liability, this court respectfully declines to apply that reasoning to the FCA Claims at issue in this case.  The court believes the better view is that the Debtor's legal duty to pay the FCA Claims had not yet arisen as of the petition date.  This is because, absent a settlement or other agreement between the parties, the only basis on which liability for the FCA Claims could be imposed on the Debtor is by judicial determination.  That has not occurred here.  To the contrary, the Qui Tam Action is in the very earliest stages.  As of the petition date, the only allegations of violations of the FCA that had been formally lodged were raised by the Relator, not the United States itself.  At that time, the United States was still considering its options with regard to the Qui Tam Action, which included the possibility of intervening and settling or dismissing the FCA Claims, even over the Relator's objection.  Under these circumstances, the fate of the FCA Claims was far from certain and the court cannot conclude that the Debtor's liability for those claims – i.e., its condition of being obligated to answer for them – had been triggered as of the filing date.  The FCA Claims are contingent.

c. *Are the FCA Claims Liquidated?*

In addition to being contingent as to the Debtor's liability, the amount of the potential damages for the FCA Claims is not readily determinable and therefore, the claim for those damages is not liquidated. Under the FCA, a person who knowingly makes false claims to the government is subject to "a civil penalty of not less than $5,000 and not more than $10,000 [as adjusted for inflation], plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The person may also be held liable for the costs of bringing the civil action under the FCA. 31 U.S.C. § 3729(a)(3). The amount of damages may also be reduced in certain instances, including when the person accused of making false claims is found to have "fully cooperated" with the Government in its investigation of the alleged violations. 31 U.S.C. § 3729(a)(2)(A)-(C).

These provisions of the FCA demonstrate that, unlike the Section 636(b) Penalty, damages for violations of the FCA are not determined by a simple mathematical formula. Instead, the amount of the damages will turn on many variables, including: the number of false claims the defendant is determined to have made, the amount of the civil penalty a court finds is appropriate for each violation, the amount of actual damages the government is found to have sustained, whether that amount is trebled or only doubled under the statutory standards, and the amount of costs incurred in bringing that action. *See Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 756 (6th Cir. 1985) (noting that "the fact that evidence must be taken to determine the amount of the claim indicates that, until then, the claim was unliquidated"). The uncertainty involved in calculating the potential damages for the FCA Claims is confirmed in the paperwork

34

that is before the court in this case.  The amount of the potential FCA damages is not set forth in the Qui Tam Complaint itself.  In the evidence before the court, the only attempts to calculate the FCA damages occurred postpetition, in the proofs of claim filed by the United States, Claim 6-1, and the Relator, Claim 5-1.  The proofs of claim themselves reflect that the amount of the FCA Damages is a mere estimate, as the Relator's claim does not include the Per-Misrepresentation Penalties in the "total liquidated damage claim under the Qui Tam Complaint," which he states is "not less than $4,506,329." (Claim 5-1, Part 2 at p. 1 of 19.)  The claim filed by the United States includes the maximum Per-Misrepresentation Penalties but not the Relator's fees and costs, and therefore, results in a slightly different amount.[17]

It is clear from the statute, and from the paperwork filed by the parties, that the determination of the amount of damages for the FCA Claims will require the exercise of judicial discretion and is not readily determined.  As a result, the claim for damages under the FCA is not liquidated.

## IV.    CONCLUSION.

Based on its independent review of the claims for damages asserted in the Qui Tam Action, the court concludes that the Debtor scheduled the claims in good faith and that the Debtor's determination that it was eligible to proceed under Subchapter V because the claims were contingent and/or unliquidated was not in error.  Specifically, the debt for the Section 636(b) Penalty is contingent because the Debtor's liability for the penalty had not been triggered as of the filing date.  Therefore, even though the amount

---

[17]    The United States asserted its Qui Tam Damages in two separate proofs of claim: Claim 6-1 for $3,054,476 in FCA Damages and Claim 19-1, filed by the SBA, for $1,470,000 representing the Section 636(b) Penalty.  These two claims total $4,524,476.

35

of the debt was readily determinable and liquidated, the Section 636(b) Penalty should not be included in the calculation of the Debtor's aggregate debts for purposes of determining its eligibility as a small business debtor.  The debt for FCA damages is both contingent and unliquidated, and is also excluded from the calculation.  In light of these findings, the Debtor qualifies as a small business debtor under § 1182(1) and § 101(51D) and may proceed under Subchapter V.  The Eligibility Objection is overruled, and a separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated October 29, 2025**



James W. Boyd
United States Bankruptcy Judge